## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RALF WERNER, *on behalf of himself and all others similarly situated*, | ) |
| | ) |
| *Plaintiff*, | ) Case No.: 2:24-cv-00599 |
| | ) |
| | ) |
| **v.** | ) |
| | ) **JURY TRIAL DEMANDED** |
| COMCAST CABLE COMMUNICATIONS, LLC d/b/a Xfinity, and CITRIX SYSTEMS, INC., | ) |
| | ) |
| *Defendants*, | ) |

## COMPLAINT – CLASS ACTION

Plaintiff Ralf Werner ("Plaintiff"), on behalf of himself and the proposed class defined below, alleges as follows:

## NATURE OF THE ACTION

1.      Defendant COMCAST CABLE COMMUNICATIONS, LLC d/b/a Xfinity ("Comcast") is one of the largest broadband service providers in the United States. According to its parent company, Comcast Corp.'s filings with the Securities and Exchange Commission, Comcast offers "broadband services over [its] hybrid fiber-optic and coaxial ('HFC') cable network, featuring gigabit downstream speeds across nearly [its] entire footprint, as well as other advanced features and functionality…" for "29.8 million customers…"[1] It touts its "Customer Commitment" to respect its customers' time, simplify their experience, and make things right if it falls short.[2] The case arises from one such shortfall.

---

[1] *Annual Report on form 10-K*, Comcast Corp., *available at:* https://www.cmcsa.com/static-files/156da323-653e-4cc6-9bb4-d239937e9d2f, (last accessed Dec. 29, 2023).
[2] *What is the Xfinity Customer Commitment?*, Xfinity, *available at* https://www.xfinity.com/support/articles/xfinity-customer-commitment, (last accessed Dec. 29,

2.      Defendant CITRIX SYSTEMS, INC. ("Citrix") is a networking, cloud computing and virtualization technology company. One of Citrix's customers is Comcast.

3.      This action arises from a critical vulnerability in two of Citrix's network appliances: its NetScaler Application Delivery Controller and NetScaler Gateway, respectively.[3] That vulnerability is CVE-2023-4966—known as "Citrix Bleed" in trade parlance—hackers have been exploiting it since at least August, and it carries a severity rating of 9.8 out of 10.[4]

4.      Given the severity of Citrix Bleed, and the rate with which it was being exploited, Citrix released a patch for it on October 10, 2023.[5] In addition to providing a patch, *inter alios*, Citrix recommended that users kill all active and persistent sessions on affected network appliances, as any sessions hijacked before the update would persist after the update.[6]

5.      Nevertheless, Comcast did not heed Citrix's warning—and that of numerous other industry experts who were sounding the alarm—and neglected to patch and/or kill all active and persistent sessions on vulnerable appliances for *six to nine days*, allowing unauthorized cybercriminals to access Comcast's systems unabated from October 16 until October 19, 2023 (the "Data Breach").[7]

---

2023).

[3] *See The latest high-severity Citrix vulnerability under attack isn't easy to fix*, ARSTECHNICA, *available at* https://arstechnica.com/security/2023/10/the-latest-high-severity-citrix-vulnerability-under-attack-isnt-easy-to-fix/, (last accessed Dec. 29, 2023).

[4] *See ibid.*

[5] *NetScaler ADC and NetScaler Gateway Security Bulletin for CVE-2023-4966 and CVE-2023-4967*, CITRIX KNOWLEDGE CENTER, *available at* https://support.citrix.com/article/CTX579459/netscaler-adc-and-netscaler-gateway-security-bulletin-for-cve20234966-and-cve20234967, (last accessed Dec. 29, 2023).

[6] *CVE-2023-4966: NetScaler Critical Security Update Now Available*, NET>SCALER APPLICATION DELIVERY AND SECURITY BLOG, *available at* https://www.netscaler.com/blog/news/cve-2023-4966-critical-security-update-now-available-for-netscaler-adc-and-netscaler-gateway/, (last accessed Dec. 29, 2023).

[7] A copy of Comcast's *Notice To Customers of Data Security Incident* is annexed hereto as Plaintiff's *Exhibit A*.

6. During that four-day window, cybercriminals infiltrated Comcast's data systems, exfiltrated massive amounts of sensitive and confidential personally identifiable information ("PII")[8] and escaped unscathed. The PII those cybercriminals "likely acquired…" included usernames and hashed passwords, and for some customers, contact information, last four digits of social security numbers, dates of birth and/or secret questions and answers.[9]

7. It was not just a small handful of Comcast subscribers whose PII was compromised in the Data Breach. According to Comcast's filing with the Office of the Maine Attorney General, the Data Breach potentially compromised the PII of nearly 36 million people.[10]

8. Yet, upon information and belief, Comcast did not start notifying victims of the Data Breach until December 18, 2023—months after it initially discovered the Data Breach.

9. Despite the seriousness of the Data Breach, which impacted millions of its customers' PII, Comcast chose not to offer any identity theft protection to its affected customers at all. Instead, Comcast merely provided a toll-free number with IDX in its Notice—"Xfinity's incident response provider managing customer notifications and call center support…"—along

---

[8] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8). To be clear, Plaintiff is not asserting that every example of identifying information was compromised in the Data Breach.

[9] *Plaintiff's Exhibit A*.

[10] *Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, OFFICE OF THE MAINE ATTORNEY GENERAL, available at:
https://apps.web.maine.gov/online/aeviewer/ME/40/49e711c6-e27c-4340-867c-
9a529ab3ca2c.shtml, (last accessed Dec. 29, 2023). Indeed, since Comcast provided its Notice Letter to the Office of the Maine Attorney General, that means that Comcast has "conduct[ed] in good faith a reasonable and prompt investigation to determine the likelihood that personal information has been or will be misused and… [it determined that] *personal information has been, or is reasonably believed to have been, acquired by an unauthorized person.*" 10 M.R.S.A. § 1348 (emphasis added).

with a link to www.xfinity.com/dataincident for "[m]ore information"—which merely links back to the Notice itself.[11]

10.    Suffice it to say, the toll-free number provided by Comcast is not particularly helpful, either:



11.    Comcast should have known that the Data Breach's victims deserved prompt and efficient notice of the Data Breach and meaningful assistance in mitigating the effects of PII misuse.

12.    At worst, Comcast, upon information or belief, knew the severity of the Data Breach but chose to ignore and downplay the size and scope of the Data Breach in its Notice Letter.

13.    Plaintiff and members of the proposed class are victims of Comcast's negligence and deceptive trade practices. Specifically, Plaintiff and members of the proposed class trusted Comcast with their PII. But Comcast betrayed that trust. Comcast failed to properly update its network appliances to prevent the Data Breach, and when the Data Breach was discovered, Defendant attempted to downplay the Data Breach's impact by failing to provide the victims with meaningful notice or assistance.

---

[11] *Plaintiff's Ex. A.*
[12] *How can I determine whether my data was accessed in Xfinity's Oct 2023 data breach?*, XFINITY COMMUNITY FORUM, *available at* https://forums.xfinity.com/conversations/customer-service/how-can-i-determine-whether-my-data-was-accessed-in-xfinitys-oct-2023-data-breach/65878ea72e4f0f28452e5d6c, (last accessed Dec. 29, 2023).

14. Defendants' negligence and deceptive practices caused real and substantial damage to Plaintiff and members of the proposed class.

15. Plaintiff and members of the proposed class therefore bring this lawsuit seeking damages and restitution for Defendants' actions.

## THE PARTIES

16. Plaintiff Ralf Werner is a natural person and citizen of the State of Tennessee, residing in Antioch, Tennessee, where he intends to remain.

17. Defendant Comcast is a Foreign Limited Liability Company, organized under the laws of the State of Delaware, which maintains its principal office in Philadelphia, Pennsylvania.

18. Defendant Citrix is a Foreign Business Corporation, organized under the laws of the State of Delaware, which maintains its principal office in Fort Lauderdale, Florida.

## JURISDICTION AND VENUE

19. This Court has subject matter jurisdiction over this cause pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because it is brought on behalf of a proposed class with at least 100 members for whom the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest and costs, and Plaintiff and other members of the class are citizens of a State and/or States different from Comcast and Citrix.

20. This Court has general personal jurisdiction over Comcast because Comcast's principal place of business is in Pennsylvania, and it regularly transacts business within the State, such that it is at home within the forum.

21. This Court has specific personal jurisdiction over Defendant Citrix pursuant to 42 Pa. Cons. Stat. § 5322, because the injuries complained about herein arise from its business transactions with Comcast within the forum.

22.     Venue is proper in this Court under 28 U.S.C. § 1391(a)(2), (b)(2) & (c)(2), because a substantial part of the events giving rise to the claims arise from Comcast's and Citrix's business activities in this District.

## COMMON FACTUAL ALLEGATIONS

**A.     Defendants' Failure to Prevent the Data Breach**

23.     Plaintiff and members of the proposed class are current and former Comcast subscribers.

24.     As a requisite to receiving its internet services, Comcast requires its customers to provide their PII.

25.     Comcast maintains records of its customers' PII such as their usernames and hashed passwords, contact information, last four digits of social security numbers, dates of birth and/or secret questions and answers, in the ordinary course of its business. These records are stored on Comcast's computer systems.

26.     Comcast informs its customers the way it collects, maintains and safeguards their PII through its Xfinity Privacy Policy (the "Privacy Policy").[13]

27.     In its Privacy Policy, Comcast represents that it will "follow industry-standard practices to secure the information [it] collect[s] to prevent the unauthorized access, use, or disclosure of any personal information [it] collect[s] and maintain[s]. These security practices include technical, administrative, and physical safeguards, which may vary, depending on the type and sensitivity of the information.…" *Ibid.*

---

[13] *See Xfinity Privacy Policy – Xfinity by Comcast*, XFINITY, *available at* https://www.xfinity.com/privacy/policy, (last visited Dec. 29, 2023).

28.    Comcast represented to its customers that it would take reasonable measures to keep their PII secure, and Plaintiff and members of the proposed class reasonably relied on that representation.

29.    Citrix developed, marketed, and sold two network appliances along with cloud-based services: its NetScaler Application Delivery Controller and NetScaler Gateway. Citrix negligently designed those network appliances and cloud-based services, such that they were susceptible to a zero-day exploit—Citrix Bleed.[14]

30.    Comcast was one of Citrix's customers that used its defective network appliances and cloud-based services.

31.    Citrix released a patch for Citrix Bleed on October 10, 2023.[15] In addition to providing a patch, *inter alios*, Citrix recommended that users kill all active and persistent sessions on affected network appliances, as any sessions hijacked before the update would persist after the update.[16]

32.    Nevertheless, Comcast did not heed Citrix's warning—and that of numerous other industry experts who were sounding the alarm—and neglected to patch and/or kill all active and persistent sessions on vulnerable appliances for *six to nine days*, allowing unauthorized cybercriminals to access Comcast's systems unabated from October 16 until October 19, 2023.[17]

33.    During that four-day window, cybercriminals infiltrated Comcast's data systems, exfiltrated massive amounts of sensitive and confidential PII and escaped unscathed. The PII those cybercriminals "likely acquired…" included usernames and hashed passwords, and for some

---

[14] *See The latest high-severity Citrix vulnerability under attack isn't easy to fix, supra*, note 3.

[15] *NetScaler ADC and NetScaler Gateway Security Bulletin for CVE-2023-4966 and CVE-2023-4967, supra*, note 5.

[16] *CVE-2023-4966: NetScaler Critical Security Update Now Available, supra*, note 6.

[17] *See* Plaintiff's *Exhibit A*.

customers, contact information, last four digits of social security numbers, dates of birth and/or secret questions and answers.[18]

34.    According to Comcast's filing with the Office of the Maine Attorney General, the Data Breach potentially compromised the PII of virtually all its subscribers—totaling nearly 36 million people.[19]

35.    Yet, upon information and belief, Comcast did not start notifying victims of the Data Breach until December 18, 2023—months after it initially discovered the Data Breach.

36.    In its dilatory Notice Letter, Comcast did not explain how the Data Breach happened. *See ibid.* And, although Comcast claims that it "promptly patched and mitigated [its] systems…" to address Citrix Bleed, Comcast did not specify when it took those measures either. *Ibid.*

37.    Comcast stated that the PII that was accessed by unauthorized actors during the Data Breach included Plaintiff's and each class member's "usernames and hashed passwords… names, contact information, last four digits of social security numbers, dates of birth and/or secret questions and answers." *Ibid.*

38.    Upon information and belief, the Data Breach happened because Brightline neglected to institute rudimentary zero-day attack prevention best practices, including:

  a.  Leveraging Windows Defender Exploit Guard, which employs attack surface reduction, network protection and controlled folder access.

  b.  Implementing threat intelligence solutions.

  c.  Employing next-generation antivirus.

---

[18] *Ibid.*
[19] *Office of the Maine AG: Consumer Protection Privacy, Identity Theft and Data Security Breaches*, *supra*, note 10.

    d.   Implementing strong patch management protocols.

    e.   Employing input validation.

    f.   Employing an AI-powered cybersecurity solution.

    g.   Ensuring use of mobile threat prevention.

    h.   Implementing a strong data backup system.

    i.   Maintaining an adequate incident response plan.[20]

39.    Additionally, Brightline could have instituted the following data security measures to prevent the Data Breach:

    a.   Configure firewalls to block access to known malicious IP addresses.

    b.   Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

    c.   Execute operating system environments or specific programs in a virtualized environment.

    d.   Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[21]

40.    Defendants' negligent conduct caused the Data Breach. Citrix negligently designed its network appliances and related cloud-based services such that they were susceptible to Citrix Bleed. Comcast failed to comply with industry data security standards and allowed its customers'

---

[20] *Top 10 zero day attack prevention best practices 2022*, CyberTalk (June 14, 2022), *available at* https://www.cybertalk.org/2022/06/14/top-10-zero-day-attack-prevention-best-practices-2022/.
[21] Natalie Goriel, *14 Tips to Protect Your business from Ransomware Attacks*, U.S. Small Bus. Admin. (May 18, 2017), *available at* https://www.sba.gov/blog/14-tips-protect-your-business-ransomware-attacks.

PII to be accessed and stolen by failing to implement measures that could have prevented or mitigated the Data Breach.

41.    Comcast ultimately admitted to the Data Breach on or about December 18, 2023.

42.    Comcast encouraged its current and former customers to "remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring your credit reports." **Ex. A**.

43.    Comcast also suggested that victims of the Data Breach contact the three credit-reporting bureaus to either place a "security freeze" or a "fraud alert" on their credit reports. *Ibid.*

**B.    Plaintiff and the Proposed Class Face Significant Risk of Identity Theft**

44.    Plaintiff and members of the proposed class have suffered injury from the misuse of their PII that can be directly traced to Defendants.

45.    The ramifications of Defendants' failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's usernames and hashed passwords, names, contact information, last four digits of social security numbers, dates of birth and/or secret questions and answers, and/or other information, without permission, to commit fraud or other crimes.

46.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.[22]

47.    As a result of Defendants' failure to prevent the Data Breach, Plaintiff and the proposed class have suffered and will continue to suffer damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at an increased risk of suffering:

---

[22] *Study Shows One in Four Who Receive Data Breach Letter Become Fraud Victims*, ThreatPost.com (last visited, Feb. 21, 2013), https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/.

a.      The loss of the opportunity to control how their PII is used;

b.      The diminution in value of their PII;

c.      The compromise and continuing publication of their PII;

d.      Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

e.      Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

f.      Delay in receipt of tax refund monies;

g.      Unauthorized use of stolen PII; and

h.      The continued risk to their PII, which remains in the possession of Comcast and is subject to further breaches so long as Comcast fails to undertake the appropriate measures to protect the PII in their possession.

48.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.[23]

49.    The value of Plaintiff's and the proposed class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen private information openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

---

[23] *See* Brian Stack, *Here's How Much Your Personal Information is Selling for on the Dark Web*, EXPERIAN, (Dec. 15, 2017), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last visited Sept. 22, 2021).

50.     It can take victims years to spot identity or PII theft, giving criminals plenty of time to milk that information for cash.

51.     One such example of criminals using PII for profit is the development of "Fullz" packages.[24]

52.     Cyber-criminals can cross-reference multiple sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

53.     The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed class, and it is reasonable for any trier of fact, including this Court or a jury, to find that

---

[24] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record or more on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz", which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See, e.g.*, Brian Krebs, *Medical Records For Sale in Underground Stolen From Texas Life Insurance Firm*, KREBS ON SECURITY, (Sep. 18, 2014), *available at* https://krebsonsecurity.com/tag/fullz/, (last visited Sept. 22, 2021).

Plaintiff's and other members of the proposed class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

54.     According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

55.     Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

56.     Moreover, considering the COVID-19 pandemic, Plaintiff's and the Class's PII can be used to fraudulently obtain emergency stimulus or relief payments or other forms of monetary compensation, unemployment and/or enhanced unemployment benefits.

57.     In addition to out-of-pocket expenses that can exceed thousands of dollars for the victim of new account identity theft, and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

58.     Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

59.     The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable) form of currency. In an FTC roundtable presentation, former Commissioner, Pamela Jones Harbour, stated that "most consumers cannot begin to comprehend the types and

amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[25]

60.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[26] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[27]

61.    According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout.[28] The FTC treats the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

---

[25] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, (Dec. 7, 2009),
http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited September 22, 2021).
[26] *Start With Security, A Guide for Business*, FTC (last visited Sept. 22, 2021),
https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf
[27] *Ibid.*
[28] *See* Taking Charge, What to Do If Your Identity is Stolen, FTC, at 3 (2012),
//www.consumer.ftc.gov/articles/pdf-0009-taking-charge.pdf (last visited April 28, 2021).

62.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ⁋ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ⁋ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations.

63.    Comcast disclosed the PII of Plaintiff and members of the proposed class for criminals to use in the conduct of criminal activity. Specifically, Comcast opened up, disclosed, and exposed the PII of Plaintiff and members of the proposed class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (*i.e.*, identity fraud), all using the stolen PII.

64.     Comcast's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PII of Plaintiff and millions of members of the proposed class to unscrupulous operators, con artists and outright criminals.

65.     Comcast's failure to properly and promptly notify Plaintiff and members of the proposed class of the Data Breach exacerbated Plaintiff's and members of the proposed class's injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

### PLAINTIFF'S EXPERIENCE

66.     Plaintiff Ralf Werner is a natural person and citizen of the State of Tennessee, residing in Antioch, Tennessee, where he intends to remain.

67.     Plaintiff is a current customer of Comcast.

68.     As a condition precedent to subscribing with Comcast, it required Plaintiff to provide it with his username, passwords, contact information, Social Security number, date of birth and/or secret questions and answers.

69.     Plaintiff provided Comcast with his PII to receive its services.

70.     Plaintiff has already incurred harm because of the Data Breach.

71.     Plaintiff has also expended considerable time and effort monitoring his accounts to protect himself from additional identity theft. Plaintiff fears for his personal financial security and is experiencing feelings of rage and anger, anxiety, sleep disruption, stress, fear, and physical pain. This goes far beyond allegations of mere worry or inconvenience; it is exactly sort of injury and harm to a Data Breach victim that is contemplated and addressed by law.

72. Plaintiff remains at a continued risk of harm due to the exposure and potential misuse of his personal data by criminal hackers.

## **CLASS ACTION ALLEGATIONS**

73. Plaintiff brings this action pursuant to Fed. R. Civ. Proc. 23 on behalf of himself and all members of the proposed class (the "Class") as defined as:

> (Nationwide Class) All individuals whose PII was compromised in the Data Breach.

> (Tennessee Subclass) All citizens of the State of Tennessee whose PII was compromised in the Data Breach.

74. The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendants or their parents have a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

75. Plaintiff and members of the Class satisfy the numerosity, commonality, typicality, adequacy, and predominance prerequisites for suing as representative parties.

76. **Numerosity:** The exact number of members of the Class is unknown but, upon information and belief, it is estimated to approximate 35,879,455, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Comcast's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques like those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

77. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff, and the members of the Class sustained damages arising out of the Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendants' uniform illegal conduct.

78. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with or are antagonistic to those of the Class and Defendants have no defenses unique to Plaintiff.

79. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a. Whether Defendants violated the laws asserted herein, including statutory privacy laws;

b. Whether Defendants had a duty to use reasonable care to safeguard Plaintiff's and members of the Class's PII;

c. Whether Defendants breached the duty to use reasonable care to safeguard members of the Class's PII;

d. Whether Defendants breached their contractual promises to safeguard Plaintiff's and members of the Class's PII;

e. Whether Plaintiff and members of the Class were third-party beneficiaries of Citrix's agreement with Comcast;

f.      Whether Defendants knew or should have known about the inadequacies of their data security policies and system and the dangers associated with storing sensitive PII;

g.      Whether Defendants failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and members of the Class's PII from unauthorized release and disclosure;

h.      Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendants' computer systems to safeguard and protect Plaintiff's and members of the Class's PII from unauthorized release and disclosure;

i.      Whether Comcast took reasonable measures to determine the extent of the Data Breach after it was discovered;

j.      Whether Comcast's delay in informing Plaintiff and members of the Class of the Data Breach was unreasonable;

k.      Whether Comcast's method of informing Plaintiff and other members of the Class of the Data Breach was unreasonable;

l.      Whether Defendants' conduct was likely to deceive the public;

m.      Whether Defendants are liable for negligence or gross negligence;

n.      Whether Defendants' conduct, practices, statements, and representations about the Data Breach violated applicable state laws;

o.      Whether Plaintiff and members of the Class were injured as a proximate cause or result of the Data Breach;

p.    Whether Plaintiff and members of the Class were damaged as a proximate

cause or result of Defendants' breach of its contract with Plaintiff and members of the

Class;

q.    Whether Defendants' practices and representations related to the Data

Breach breached implied warranties;

r.    What the proper measure of damages is; and

s.    Whether Plaintiff and members of the Class are entitled to restitutionary,

injunctive, declaratory, or other relief.

80.    **Superiority:** A class action is also a fair and efficient method of adjudicating the

controversy because class proceedings are superior to all other available methods for the fair and

efficient adjudication of this controversy as joinder of all parties is impracticable. The damages

suffered by the individual members of the Class will likely be relatively small, especially given

the burden and expense of individual prosecution of the complex litigation necessitated by

Defendants' actions. Thus, it would be virtually impossible for the individual members of the Class

to obtain effective relief from Defendants' misconduct. Even if members of the Class could sustain

such individual litigation, it would still not be preferable to a class action, because individual

litigation would increase the delay and expense to all parties due to the complex legal and factual

controversies presented in this Complaint. By contrast, a class action presents far fewer

management difficulties and provides the benefits of single adjudication, economy of scale, and

comprehensive supervision by a single court. Economies of time, effort, and expense will be

fostered, and uniformity of decisions ensured.

81.    A class action is therefore superior to induvial litigation because:

a.      The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendants' conduct economically feasible in the absence of the class action procedural device;

b.      Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c.      The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

**COUNT I**
**Negligence**
**(On Behalf of Plaintiff and the Class against Defendants)**

82.      Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

83.      Plaintiff and members of the Class entrusted their PII to Comcast. Comcast owed to Plaintiff and other members of the Class a duty to exercise reasonable care in handling and using the PII in its care and custody, including implementing industry-standard security procedures sufficient to reasonably protect the information from the Data Breach, theft, and unauthorized use that came to pass, and to promptly detect attempts at unauthorized access.

84.      Likewise, Citrix owed a duty of ordinary and reasonable care to design and implement its network appliances and cloud related services to the public, such that the sensitive and confidential PII that traverse such services would not be subject to the Data Breach that ultimately came to pass.

85.     Defendants owed a duty of care to Plaintiff and members of the Class because it was foreseeable that Defendants' failure to adequately safeguard their PII in accordance with state-of-the-art industry standards concerning data security would result in the compromise of that PII—just like the Data Breach that ultimately came to pass. Defendants acted with wanton and reckless disregard for the security and confidentiality of Plaintiff's and members of the Class's PII by disclosing and providing access to this information to third parties and by failing to properly supervise both the manner in which the PII was stored, used, and exchanged, and those in its employ who were responsible for making that happen.

86.     Comcast owed to Plaintiff and members of the Class a duty to notify them within a reasonable time frame of any breach to the security of their PII. Comcast also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is required and necessary for Plaintiff and members of the Class to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the harm caused by the Data Breach.

87.     Defendants owed these duties to Plaintiff and members of the Class because they are members of a well-defined, foreseeable, and probable class of individuals who Defendants knew or should have known would suffer injury-in-fact from Defendants' inadequate security protocols. Comcast actively sought and obtained Plaintiff's and members of the Class's personal information and PII for subscription related tasks. Plaintiff and members of the Class were required to provide their personal information and PII to Comcast to receive cable internet and services from it, and Comcast retained that information.

88.     The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Comcast holds vast amounts of PII, it was inevitable that

unauthorized individuals would attempt to access Comcast's databases containing the PII—whether by malware or otherwise.

89.    PII is highly valuable, and Defendants knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and members of the Class and the importance of exercising reasonable care in handling it.

90.    Defendants breached their respective duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers, designing its network appliances and cloud-related services, and in handling and securing the personal information and PII of Plaintiff and members of the Class which actually and proximately caused the Data Breach and Plaintiff's and members of the Class's injury. Comcast further breached its duties by failing to provide reasonably timely notice of the Data Breach to Plaintiff and members of the Class, which actually and proximately caused and exacerbated the harm from the Data Breach and Plaintiff's and members of the Class's injuries-in-fact. As a direct and traceable result of Defendants' negligence and/or negligent supervision, Plaintiff and members of the Class have suffered or will suffer damages, including monetary damages, increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

91.    Defendants' breach of their common-law duties to exercise reasonable care and their failures and negligence actually and proximately caused Plaintiff's and members of the Class's actual, tangible, injury-in-fact and damages, including, without limitation, the theft of their PII by criminals, improper disclosure of their PII, lost benefit of their bargain, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Defendants' negligence, which injury-in-fact and damages are ongoing, imminent, immediate, and which they continue to face.

## COUNT II
### Negligence *Per Se* for Violation of the FTC Act, 15 U.S.C. § 45
### (On Behalf of Plaintiff and the Class against Comcast)

92.     Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

93.     Pursuant to the FTC Act, 15 U.S.C. § 45, Comcast had a duty to provide fair and adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

94.     Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Comcast, of failing to use reasonable measures to protect customers' PII. The FTC publications and orders promulgated pursuant to the FTC Act also form part of the basis of Comcast's duty to protect Plaintiff's and the members of the Class's sensitive PII.

95.     Comcast violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect its customers' PII and not complying with applicable industry standards as described in detail herein. Comcast's conduct was particularly unreasonable given the nature and amount of PII it had collected and stored and the foreseeable consequences of a data breach, including, specifically, the immense damages that would result to its customers in the event of a breach, which ultimately came to pass.

96.     The harm that has occurred is the type of harm the FTC Act is intended to guard against. Indeed, the FTC has pursued numerous enforcement actions against businesses that, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and members of the Class.

97.     Comcast had a duty to Plaintiff and the members of the Class to implement and maintain reasonable security procedures and practices to safeguard Plaintiff's and the Class's PII.

98.     Comcast breached its respective duties to Plaintiff and members of the Class under the FTC Act by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiff's and members of the Class's PII.

99.     Comcast's violation of Section 5 of the FTC Act and its failure to comply with applicable laws and regulations constitutes negligence *per se*.

100.     But for Comcast's wrongful and negligent breach of its duties owed to Plaintiff and members of the Class, Plaintiff and members of the Class would not have been injured.

101.     The injury and harm suffered by Plaintiff and members of the Class were the reasonably foreseeable result of Comcast's breach of its duties. Comcast knew or should have known that it was failing to meet its duties and that its breach would cause Plaintiff and members of the Class to suffer the foreseeable harms associated with the exposure of their PII.

102.     Had Plaintiff and members of the Class known that Comcast did not adequately protect subscribers' PII, Plaintiff and members of the Class would not have entrusted it with their PII.

103.     As a direct and proximate result of Comcast's negligence *per se*, Plaintiff and members of the Class have suffered harm, including loss of time and money resolving fraudulent charges; loss of time and money obtaining protections against future identity theft; financial losses related to the services Plaintiff and members of the Class purchased that they would not have had they known of Comcast's careless approach to cyber security; lost control over the value of PII; unreimbursed losses relating to fraudulent charges; losses relating to exceeding credit and debit card limits and balances; harm resulting from damaged credit scores and information; and other

harm resulting from the unauthorized use or threat of unauthorized use of stolen personal information, entitling them to damages in an amount to be proven at trial.

<u>**COUNT III**</u>
**Breach of an Implied Contract**
**(On Behalf of Plaintiff and the Class against Defendants)**

104.     Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

105.     Comcast offered to provide cable internet and television to Plaintiff and members of the Class in exchange for payment.

106.     Comcast also required Plaintiff and the members of the Class to provide it with their PII in order to receive those services.

107.     In turn, and through the Privacy Policy, Comcast agreed it would not disclose the PII it collects from customers to unauthorized persons. Comcast also promised to maintain safeguards to protect its customers' PII.

108.     Plaintiff and the members of the Class accepted Comcast's offer by providing PII to it and paying for and receiving cable internet and television services.

109.     Implicit in the parties' agreement was that Comcast would provide Plaintiff and members of the Class with prompt and adequate notice of any and all unauthorized access and/or theft of their PII.

110.     Plaintiff and the members of the Class would not have entrusted their PII to Comcast in the absence of such agreement with it.

111.     Comcast materially breached the contract(s) it had entered with Plaintiff and members of the Class by failing to safeguard such information and failing to notify them promptly

of the intrusion into its computer systems that compromised such information. Comcast further breached the implied contracts with Plaintiff and members of the Class by:

a.    Failing to properly safeguard and protect Plaintiff's and members of the Class's PII; and

b.    Failing to comply with industry standards as well as legal obligations that are necessarily incorporated into the parties' agreement;

112.    Citrix offered to provide Comcast network appliances and cloud-based services in exchange for payment.

113.    Plaintiff and the members of the Class were intended third-party beneficiaries of Citrix's agreement with Comcast.

114.    Comcast accepted Citrix's offer by paying for and receiving Citrix's network appliances and cloud-based services.

115.    Implicit in the parties' agreement was that Citrix would provide network appliances and cloud-based services that would not be susceptible to unauthorized access and/or theft of the PII therein.

116.    Citrix materially breached the contract(s) it had entered with Comcast by producing network appliances and cloud-based services that were susceptible to Citrix Bleed.

117.    The damages sustained by Plaintiff and members of the Class as described above were the direct and proximate result of Defendants' material breaches of their agreement(s).

118.    Plaintiff and members of the Class have performed as required under the relevant agreements, or such performance was waived by the conduct of Defendants.

119.    The convent of good faith and fair dealing is an element of every contract. All such contracts impose upon each party a duty of good faith and fair dealing. The parties must act with

honesty in fact in the conduct or transactions concerned. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit—not merely the letter—of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form.

120.     Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty.

121.     Defendants failed to advise Plaintiff and members of the Class of the Data Breach promptly and sufficiently.

122.     In these and other ways, Defendants violated their duty of good faith and fair dealing.

123.     Plaintiff and members of the Class have sustained damages as a result of Defendants' breaches of its agreement, including breaches thereof through violations of the covenant of good faith and fair dealing.

## COUNT IV
### Unjust Enrichment
### (On Behalf of Plaintiff and the Class against Comcast)

124.     Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

125.     This claim is pleaded in the alternative to the breach of implied contractual duty claim.

126.     Plaintiff and members of the Class conferred a valuable benefit upon Comcast in the form of money for cable internet and television services.

127.    Comcast appreciated or had knowledge of the benefits conferred upon itself by Plaintiff and members of the Class. Comcast also benefited from the receipt of Plaintiff's and members of the Class's PII, as this was used to facilitate their subscriptions.

128.    As a result of Comcast's conduct, Plaintiff and members of the Class suffered actual damages in an amount equal to the difference between what they paid for cable internet and television services with reasonable data privacy and security practices and procedures that Plaintiff and members of the Class expected, and cable television and internet services without unreasonable data privacy and security practices and procedures, which is what they actually received.

129.    Under principles of equity and good conscience, Comcast should not be permitted to retain the money belonging to Plaintiff and members of the Class because Comcast failed to implement (or adequately implement) the data privacy and security practices and procedures for itself that Plaintiff and members of the Class expected and that were otherwise mandated by federal, state, and local laws and industry standards.

130.    Comcast should be compelled to disgorge into a common fund for the benefit of Plaintiff and members of the Class all unlawful or inequitable proceeds received by it as a result of the conduct and Data Breach alleged herein.

**COUNT V**
**Invasion of Privacy**
**(On Behalf of Plaintiff and the Class against Comcast)**

131.    Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

132.    Comcast publicized private details and facts not generally known to the public, not publicly available, and not of legitimate public concern about Plaintiff and members of the Class

by disclosing and exposing Plaintiff's and members of the Class's PII to enough people that it is reasonably likely those facts will become known to the public at large, including, without limitation, on the dark web and elsewhere.

133.    The disclosure of subscribers' usernames and hashed passwords, contact information, last four digits of social security numbers, dates of birth and/or secret questions and answers is particularly harmful and would be offensive to a reasonable person of ordinary sensibilities.

134.    Comcast has a special relationship with Plaintiff and members of the Class and Comcast's disclosure of PII is certain to embarrass them and offend their dignity. Comcast should appreciate that the cyber-criminals who access PII would further sell and disclose the PII as they are doing. That the original disclosure is devastating to the Plaintiff and the members of the Class, even though it originally may have only been disclosed to one person or a limited number of cyber-criminals, does not render it any less a disclosure to the public-at-large.

135.    The tort of public disclosure of private facts is recognized in Tennessee. Plaintiff's and members of the Class's PII were publicly disclosed by Comcast in the Data Breach with reckless disregard for the reasonable offensiveness of the disclosure. Such disclosure is highly offensive and would be to any person of ordinary sensibilities. Comcast knew or should have known that Plaintiff's and the members of the Class's PII is not a matter of legitimate public concern. As a direct and proximate result of Comcast's conduct, Plaintiff and members of the Class have been injured and are entitled to damages.

## COUNT VI
### The Cable Communications Act of 1984, 47 U.S.C. § 551
### (On Behalf of Plaintiff and the Class against Comcast)

136.    Plaintiff and members of the Class incorporate the above allegations as if fully set forth herein.

137.    Comcast is a "cable operator" as defined by 47 U.S.C. § 522(5) & 47 U.S.C. § 551(a)(2)(C).

138.    Plaintiff and members of the Class are "persons" as defined by 47 U.S.C. § 522(15).

139.    Comcast provided "cable service" to Plaintiff and members of the Class, as defined by 47 U.S.C. § 522(6).

140.    Comcast was required by 47 U.S.C. § 551(c)(1) to "take such actions as are necessary to prevent unauthorized access to" Plaintiff's and Class members' PII "by a person other than" Comcast.

141.    Comcast failed to take such actions as were necessary to prevent the Data Breach.

142.    Accordingly, Plaintiff and the proposed Class seek actual damages but not less than liquidated damages computed at the rate of $100 a day for each day of violation or $1,000, whichever is higher under 47 U.S.C. § 551(f).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the proposed Class, requests that the Court:

A.    Certify this case as a class action on behalf of the Class defined above, appoint Plaintiff Ralf Werner as the Class representative, and appoint the undersigned as Class counsel;

B.    Award declaratory and other equitable relief as is necessary to protect the interests of Plaintiff and the Class;

C.      Award injunctive relief as is necessary to protect the interests of Plaintiff and the Class;

D.      Enter an Order enjoining Defendants from further deceptive and unfair practices and making untrue statements with respect to the Data Breach and the stolen PII;

E.      Enter an award in favor of Plaintiff and the Class that includes compensatory, exemplary, punitive damages, and statutory damages, including pre- and post-judgment interest thereon, in an amount to be proven at trial;

F.      Award restitution and damages to Plaintiff and the Class in an amount to be determined at trial;

G.      Enter an award of attorneys' fees and costs, as allowed by law;

H.      Enter an award of prejudgment and post-judgment interest, as provided by law;

I.      Grant Plaintiff and the Class leave to amend this complaint to conform to the evidence produced at trial; and

J.      Grant such other or further relief as may be appropriate under the circumstances.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.


Dated: February 8, 2024.                    Respectfully submitted,

                                By:    */s/ Patrick Howard*
                                        Patrick Howard (PA Atty ID #88572)
                                        phoward@smbb.com
                                        **SALTZ MONGELUZZI & BENDESKY, P.C.**
                                        1650 Market Street, 52nd Floor
                                        Philadelphia, PA 19103
                                        Tel: (215) 575-3895

Joe P. Leniski, Jr.*
joey@hsglawgroup.com
**HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL, PLLC**
223 Rosa L. Parks Avenue, Suite 300
Nashville, Tennessee 37203
Tel: (615) 800-6225

Peter J. Jannace*
peter@hsglawgroup.com
**HERZFELD, SUETHOLZ, GASTEL,
LENISKI & WALL, PLLC**
515 Park Avenue
Louisville, Kentucky 40208
Tel: (502) 636-4333

*Attorneys for Plaintiff*

*\*Pro Hac Vice admission forthcoming*